UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                    )
MAX-PLANCK-GESELLSCHAFT ZUR         )
FOERDERUNG DER WISSENSCHAFTEN E.V.  )
                                    )
              Plaintiff,            )
                                    )
          v.                        )CIVIL ACTION NO. 09-11168-PBS
                                    )
                                    )
WOLF GREENFIELD & SACKS, PC         )
                                    )
              Defendant.            )
_____ )
```

**MEMORANDUM AND ORDER**

September 14, 2010

Saris, U.S.D.J.

    Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften

E.V. ("Max-Planck") brings this action against the law firm Wolf

Greenfield & Sacks, PC ("Wolf Greenfield"), alleging that Wolf

Greenfield committed legal malpractice and breach of its

fiduciary duty in the course of its alleged representation of

Max-Planck.  The parties have filed cross motions for summary

judgment.  The plaintiff seeks partial summary judgment [Docket

No. 39] on the issues of whether or not there was an attorney-

client relationship between the parties and whether Wolf

Greenfield owed Max-Planck a fiduciary duty.  The defendant seeks

summary judgment on all issues [Docket No. 37].  After a hearing

and a review of the record, Max-Planck's Motion for Partial

Summary Judgment is **ALLOWED** based on the Court's finding that there was an attorney-client relationship between the parties and the finding that Wolf Greenfield owed a fiduciary duty to Max-Planck.  Wolf Greenfield's Motion for Summary Judgment is **ALLOWED** based on the Court's finding that plaintiff's claims are time-barred, with the exception of the claim for declaratory judgment, as to which the motion is **DENIED**.

## I.  BACKGROUND

The record contains the following relevant facts, which, unless noted, are undisputed.

Max-Planck is a German research institute that is a co-owner of a family of patent applications currently pending before the United States Patent and Trademark Office ("USPTO") entitled "RNA Sequence-Specific Mediators of RNA Interference" and listing Thomas Tuschl, Phillip D. Zamore, Phillips A. Sharpe, and David P. Bartel as inventors (the "Tuschl I" applications).  (Levine Aff., Ex. A ¶ 3.)  The Tuschl I applications were originally filed as provisional applications with the USPTO on March 30, 2000.  (Id., Ex. B ¶ 5.)  Although the applications were originally filed in the names of the four inventors, they were later assigned to Max-Planck, the Whitehead Institute for Biomedical Research ("Whitehead"), the Massachusetts Institute of Technology ("MIT"), and the University of Massachusetts ("UMass")

(collectively, the "co-assignees").[1]  (<u>Id.</u>, Ex. A ¶ 4; <u>id.</u>, Ex. B ¶ 5.)

Max-Planck is also the sole owner of a second family of patent applications currently pending before the USPTO entitled "RNA Interference Mediating Small RNA Molecules" that lists Thomas Tuschl, Sayda Elbashir and Winifried Lendeckel as co-inventors (the "Tuschl II" applications).  (<u>Id.</u>, Ex. A ¶ 5.)

In 2001, the four co-assignees entered into a Joint Invention and Joint Marketing Agreement (the "2001 Agreement") that assigned Whitehead primary responsibility for filing, prosecuting and maintaining the patent applications relating to the Tuschl I inventions.  (Mone Decl., Ex. 10 (2001 Agreement).) The 2001 Agreement stated as its purpose that the co-assignees "wish to patent and license the JOINT INVENTION in the most expeditious manner for the public benefit."  (<u>Id.</u>)  The agreement governed the joint licensing of the Tuschl I and Tuschl II applications and set out revenue sharing provisions.  (<u>Id.</u>)

In 2003, Whitehead, MIT, and Max-Planck, but not UMass, entered into a second agreement called the Joint Invention and Joint Marketing Agreement for RNAi Therapeutic Purposes (the "2003 Agreement") that licensed the Tuschl I technology for

---

[1] The conflict among the co-owners is the subject of a second suit before this Court.  <u>See</u> Max-Planck-Gesellschaft Zur Forderung Der Wissenschaften E.V. et al. v. Whitehead Institute for Biomedical Research et al., No. 1:09-cv-11116-PBS.

therapeutic purposes.  The 2003 Agreement also provides that the filing, prosecution and maintenance of the Tuschl I patent applications "shall be managed by and the primary responsibility of Whitehead" and that the other parties to the 2003 Agreement shall have "reasonable opportunity to comment and advise." (Levine Aff., Ex. E.)  Between 2001 and 2003, the inventors and co-owners executed powers of attorney appointing the law firm Hamilton, Brook, Smith & Reynolds ("HBSR") and Patricia Granahan, who was then the in-house counsel for Whitehead, to prosecute the applications and transact all related business before the USPTO. (Pl.'s Statement of Undisputed Facts ("Pl.'s SUF") ¶¶ 24, 42, 44.)

Whitehead, MIT and Max-Planck ultimately licensed their interest in the Tuschl I patent applications to Alnylam Pharmaceuticals, Inc. ("Alnylam") for therapeutic use.  (Levine Aff., Ex. F.)  UMass licensed its interest in the Tuschl I patent applications for therapeutic use to Alnylam's competitor, Sirna Therapeutics, which was later acquired by Merck & Co.  (Id.) After these interests were licensed, disagreements arose among the co-assignees in late 2003 or early 2004 when Sirna asserted that it had access to certain technology that Max-Planck claimed was solely part of the Tuschl II invention.  (Levine Aff., Ex. G at 459, 461 (Erselius Dep.).)  The disagreement specifically pertained to the improper use of certain information and data relating to 3' overhangs (a particular species of short RNA

-4-

molecules), which Max-Planck alleges were developed exclusively in connection with the Tuschl II invention and should not be included in the Tuschl I patent applications.  (Mone Decl., Ex. 71 at 264-66, 331-32, 395 (Erselius Dep.); id., Ex. 72 at 54-59, 65-66, 68-69, 115, 315 (Lockhart Dep.).)

While this disagreement was still ongoing, Whitehead engaged Wolf Greenfield to prosecute the Tuschl I patent applications. (See Levine Aff., Ex. P (Engagement Letter).)  The engagement letter, sent by attorney Helen Lockhart of Wolf Greenfield to the director of the intellectual property office at Whitehead, is not copied to any third parties and states "[w]e are very pleased you have selected Wolf Greenfield as your intellectual property counsel in connection with the [Tuschl I patent applications]." (Id.)  On March 31, 2004, Max-Planck and the other co-assignees of the Tuschl I patent applications executed an identical "Revocation of Powers of Attorney and Appointment of New Attorneys," that revoked the Power of Attorney given to HBSR and appointed Wolf Greenfield as their exclusive counsel to prosecute the Tuschl I applications and "conduct all business in the [USPTO]."  (Mone Decl., Ex. 27.)  Max-Planck supports its allegations that it engaged the legal services of Wolf Greenfield by noting that Wolf Greenfield sent confidential draft documents to Max-Planck and the other co-owners, seeking recommendations for changes to drafts and comments on the strategy for the patent prosecution of the Tuschl I applications.  (Pl.'s SUF ¶¶ 32, 36-

-5-

37.)  In addition, plaintiff points out that Max-Planck sent
letters to Wolf Greenfield requesting legal advice relating to
the patent prosecution of the Tuschl I applications.  (See, e.g.,
Mone Decl., Ex. 22 at 331 (Lockhart Dep.); id., Ex. 32 (Erselius
Letter); id., Ex. 33 (1/7/09 Erselius Email); id., Ex. 34
(11/5/04 Erselius Letter).)

On July 20, 2009, Max-Planck petitioned the USPTO to revoke
its Appointment in favor of Wolf Greenfield and to allow the
appointment of the law firm Rothwell Figg on its behalf and to
act for less than all of the applicants.  (Levine Aff., Exs. JJ-
LL.)  The USPTO granted this petition on September 3, 2009 on the
basis of the "divergent interests" of Max-Planck and the other
co-owners.  (Id., Ex. MM.)

## II. DISCUSSION

### A.  Legal Standard

Summary judgment is appropriate when "'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.'"  Barbour v.
Dynamics Research Corp., 63 F.3d 32, 36-37 (1st Cir. 1995)
(quoting Fed. R. Civ. P. 56(c)).  To succeed on a motion for
summary judgment, "the moving party must show that there is an
absence of evidence to support the nonmoving party's position."

Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also
Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made such a showing, the burden
shifts to the non-moving party, who "'may not rest on mere
allegations or denials of his pleading, but must set forth
specific facts showing there is a genuine issue for trial.'"
Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 256 (1986)).  The non-moving party must establish
that there is "sufficient evidence favoring [its position] for a
jury to return a verdict [in its favor].  If the evidence is
merely colorable or is not significantly probative, summary
judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal
citations omitted).  The Court must "view the facts in the light
most favorable to the non-moving party, drawing all reasonable
inferences in that party's favor."  Barbour, 63 F.3d at 36
(citation omitted).

"Where, as here, a district court rules simultaneously on
cross-motions for summary judgment, it must view each motion,
separately, through this prism."  Estate of Hevia v. Portrio
Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Blackie v. Maine,
75 F.3d 716, 721 (1st Cir. 1996) ("Barring special circumstances,
the nisi prius court must consider each motion separately,
drawing inferences against each movant in turn.").

**B.   Plaintiff's Motion for Partial Summary Judgment**

Plaintiff moves for partial summary judgment on two issues:
(1) whether or not an attorney-client relationship existed
between Max-Planck and Wolf Greenfield; and (2) whether or not
Wolf Greenfield owed a fiduciary duty to Max-Planck.

**1.    Attorney-Client Relationship[2] - The <u>DeVaux</u> Analysis**

In order to prevail on a claim for legal malpractice, the
plaintiff must establish, among other things, that an attorney-
client relationship existed.  <u>See</u> <u>Williams v. Ely</u>, 423 Mass. 467,
475-76, 668 N.E.2d 799, 805 (1996).  Under Massachusetts law, the
existence of an attorney-client relationship is ordinarily a
question of fact.  <u>Page v. Frazier</u>, 388 Mass. 55, 61-62, 445
N.E.2d 148, 152 (1983) (holding that whether attorney-client
relationship existed was a disputed issue to be resolved by the
trier of fact).

An attorney-client relationship may be based on an express
contract or, in some cases, may be implied.  Under Massachusetts
law, courts apply a three-part test to determine whether an
implied attorney-client relationship exists.

> An attorney-client relationship may be implied when (1)
> a person seeks advice or assistance from an attorney,
> (2) the advice or assistance sought pertains to matters
> within the attorney's professional competence, and (3)
> the attorney expressly or impliedly agrees to give or

---

[2] The parties agree that Massachusetts law governs the issue
of whether or not an attorney-client relationship exists.  <u>See</u>
<u>Hopper v. Frank</u>, 16 F.3d 92, 96 (5th Cir. 1994) ("The existence
of an attorney-client relationship is determined under state
law.").

> actually gives the desired advice or assistance.  In
> appropriate cases the third element may be established
> by proof of detrimental reliance, when the person
> seeking legal services reasonably relies on the
> attorney to provide them and the attorney, aware of
> such reliance, does nothing to negate it.

DeVaux v. Am. Home Assurance Co., 387 Mass. 814, 817-18, 444

N.E.2d 355, 357 (1983) (internal citations omitted).

In this case, Max-Planck's argument that an attorney-client

relationship existed relies in part on the power of attorney

executed in favor of Wolf Greenfield with the USPTO.  "General

principles of agency law indicate that a power of attorney does

not ipso facto create an attorney-client relationship."  Sun

Studs, Inc. v. Applied Theory Assocs., Inc., 772 F.2d 1557, 1568

(Fed. Cir. 1985); see also Int'l Strategies Group, Ltd. v.

Greenberg Traurig, LLP, 482 F.3d 1, 8 (1st Cir. 2007) ("While the

power of attorney may have some impact on our analysis of whether

an implied attorney-client relationship was formed, it is certain

that such a limited power of attorney did not create an express

attorney-client relationship.").  The Sun Studs case involved a

question of whether an attorney-client relationship existed

between an inventor and his assignee's patent attorney, who was

prosecuting the patent application and in favor of whom the

inventor executed a power of attorney.  Id.  The Sun Studs court

found that an attorney-client relationship did not exist because

the inventor had relinquished all substantive rights in the

subject matter of the representation (the patent application),

-9-

and the interactions between the inventor and the attorney were merely "technical."  This case involves the question of whether an attorney-client relationship exists between Max-Planck and its co-assignee's patent counsel.  See Merck Eprova AG v. ProThera, Inc., 670 F. Supp. 2d 201, 212 (S.D.N.Y. 2009) (holding that Sun Studs provides "no guidance with respect to the issue of joint representation for co-owners of patent rights").  Accordingly, the Court must perform the DeVaux analysis to determine if the execution of a power of attorney, in addition to other factors, creates a genuine issue of material fact regarding the existence of an implied attorney-client relationship.

The first DeVaux prong is that Max-Planck must have sought legal advice or assistance from Wolf Greenfield.  "Courts interpreting DeVaux have understood this first prong to require concrete communication by the plaintiff requesting that the attorney represent him, or explicitly seeking individualized legal advisement."  Int'l Strategies Group, 482 F.3d at 8.  In addition to Max-Planck's execution of a power of attorney in favor of Wolf Greenfield, Max-Planck initiated several requests for its legal opinion relating to the Tuschl I patent prosecution.  (See, e.g., Mone Decl., Ex. 22 at 331 (Lockhart Dep.); id., Ex. 32 (Erselius Letter); id., Ex. 33 (1/7/09 Erselius Email); id., Ex. 34 (11/5/04 Erselius Letter).)  For example, on October 12, 2008, Joern Erselius of Max-Planck wrote a letter to Wolf Greenfield stating:

-10-

> As one of the owners of [the Tuschl I invention], and
> thus one of your clients, and to better understand the
> position of [Tuschl I] before the U.S. Patent and
> Trademark Office, we request that you provide us with a
> copy of the memo regarding inherent obviousness which
> your firm prepared for this application.

(Mone Decl., Ex. 32.)  Lockhart responded to that letter stating:

"We have reviewed case law on inherent obviousness . . . .  We

used the referenced case law analysis to prepare arguments

presented in the draft response to office action that we

circulated on November 26, 2008.  Another copy of that draft is

attached for your convenience."  (Id., Ex. 56.)

In addition, in 2004, Max-Planck requested that Wolf

Greenfield file an "Information Disclosure Statement" to inform

the USPTO that the Tuschl I applications would not rely on the

Tuschl II material and priority application as support for their

claims and indicating that the Tuschl II material was the

inventive work of the Tuschl II inventors.  (Mone Decl., Ex. 71

at 277, 320-22 (Erselius Dep.); id., Ex. 72 at 68-69 (Lockhart

Dep.).)

As a side note, Max-Planck's licensee, Alnylam, paid for a

portion of Wolf Greenfield's services on Max-Planck's behalf.

While payment for services does not per se create an attorney-

client relationship, it is one factor to consider.

Based on these undisputed facts, the record is clear that

Max-Planck did seek legal assistance from Wolf Greenfield, and

accordingly the first DeVaux factor is satisfied.

As to the second requirement under <u>DeVaux</u>, it does not appear that the parties dispute that "the advice or assistance sought pertains to matters within the [Wolf Greenfield's] professional competence."  387 Mass. at 818, 444 N.E.2d at 357.

Finally, the <u>DeVaux</u> test requires Max-Planck to show that Wolf Greenfield "expressly or impliedly agree[d] to give or actually [gave] the desired advice or assistance."  <u>Id.</u>  This requirement may also be met by establishing proof of detrimental reliance by the plaintiff.  "Courts customarily determine the existence <u>vel non</u> of an attorney-client relationship by evaluating whether the putative client's belief that such a relationship existed was objectively reasonable under all the circumstances."  <u>F.D.I.C. v. Ogden Corp.</u>, 202 F.3d 454, 463 (1st Cir. 2000).  Wolf Greenfield places much emphasis on the fact that Max-Planck was represented by other counsel in connection with the patent applications, but the presence of another attorney-client relationship does not compel the conclusion that Wolf-Greenfield did not have an attorney-client relationship with Max-Planck.

In this case, Max-Planck gives several examples of actions by Wolf Greenfield that, it argues, implied an attorney-client relationship.  It is undisputed that Wolf Greenfield did provide the co-assignees of the Tuschl I applications with legal services through its prosecution of the patent applications before the USPTO.  In the course of that representation, Helen Lockhart, an

-12-

attorney at Wolf Greenfield, has submitted papers to the USPTO
related to the Tuschl I patent applications in which she refers
to herself as "Applicants' Attorney."  (Pl.'s SUF ¶ 35.)  In
addition, she sent confidential draft documents to Max-Planck in
which she responded to its requests for legal advice, and sought
input on draft papers to be filed in the Tuschl I applications
and comments on the strategy of the Tuschl I patent prosecution.
(See id. ¶ 36; see also Mone Decl., Ex. 22 at 398-99 (Lockhart
Dep.) ("I sent drafts [to Max-Planck] for review, accepted
comments, and sent them copies of what was filed and what was
submitted from the Patent Office."); Mone Decl., Ex. 39.)  Max-
Planck also made recommendations to Wolf Greenfield on the
prosecution of the Tuschl I applications.  (See Mone Decl., Exs.
44-50, 53.)

In July 2005, in response to a request from Max-Planck in
2004, Wolf Greenfield filed an Information Disclosure Statement
with the USPTO.  (Mone Decl., Ex. 71 at 277 (Erselius Dep.); id.,
Ex. 79 (email from Max-Planck approving a revised draft of the
Information Disclosure Statement in 2005).)  This is a concrete
example of Wolf Greenfield's provision of legal services to Max-
Planck.  (Pl.'s Add'l SUF ¶¶ 21-23.)

It is true that in one communication between Helen Lockhart
and Joern Erselius of Max-Planck on December 19, 2008, Wolf
Greenfield did "note that we represent the Whitehead Institute in
the above-identified matter.  It is our understanding that you,

like the other co-owners, are represented in this matter by
independent counsel." (Mone Decl., Ex. 38.) However, this was
the first time in the record that Wolf Greenfield made any
outright statement to Max-Planck disclaiming representation.

There is no factual dispute that Wolf Greenfield has
responded to requests for legal assistance and services from Max-
Planck in connection with the prosecution of Tuschl I patent
prosecution. Accordingly, the third and final DeVaux prong is
satisfied. Based on the undisputed facts, the Court concludes
that there was an attorney-client relationship between Max-Planck
and Wolf Greenfield and will allow Max-Planck's motion for
partial summary judgment as to that issue.

## 2.   Community of Interest Doctrine

A second theory of liability raised by Max-Planck is the
"community of interest" doctrine. "When the same attorney
represents the interests of two or more entities on the same
matter, those represented are viewed as joint clients for
purposes of privilege." In re Regents of Univ. of Cal., 101 F.3d
1386, 1389 (Fed. Cir. 1996) (citing Simpson v. Motorists Mut.
Ins. Co., 494 F.2d 850, 855 (7th Cir. 1974)). Under this
doctrine, when two or more parties are jointly represented by the
same lawyer, communications about matters of common interest are
not privileged as between the co-clients. See Restatement
(Third) of the Law Governing Lawyers § 75 (2000).

In this case, Wolf Greenfield claims that it considered only Whitehead to be its client, not Max-Planck. "However, the issue is not who employed the attorney, but whether the attorney was acting in a professional relationship to the person asserting the [attorney-client] privilege." Regents, 101 F.3d at 1390. In the Regents case, the co-assignee's attorneys "advised and consulted freely" with the plaintiff on matters relating to patent prosecution. The attorneys "received confidential information" from and gave legal advice to the plaintiff. Id. That court held that the co-assignees had a community of interest because "[b]oth parties had the same interest in obtaining strong and enforceable patents." Id.; see also Hillerich & Bradsby Co. v. MacKay, 26 F. Supp. 2d 124, 126 (D.D.C. 1998) ("Typically, parties jointly developing a patent with an attorney have a 'common legal interest' in obtaining the greatest protection and in exploiting the patents. . . . The parties thereby develop a 'community of interest,' which establishes a joint attorney-client relationship among them and the attorney.").

However, Wolf Greenfield correctly points out that the "community of interest" doctrine is generally applied to disputes over whether shared communications are privileged. See In re Regents, 101 F.3d at 1389; Hillerich, 26 F. Supp. 2d at 125. Under Massachusetts law, the common interest doctrine "prevents waiver of the attorney-client privilege when otherwise privileged communications are disclosed to and shared, in confidence, with

-15-

an attorney for a third person having a common legal intent for
the purpose of rendering legal advice to the client." <u>Hanover
Ins. Co. v. Rapo & Jepsen Ins. Servs., Inc.</u>, 449 Mass. 609, 614,
870 N.E.2d 1105, 1110 (2007).  Accordingly, the Court declines
the invitation to expand the "community of interest" doctrine
developed in the context of privilege law.  The appropriate
standard for determining whether an implied attorney-client
relationship exists under Massachusetts law is the <u>DeVaux</u> test.

### 3.   Fiduciary Duty

As an alternative theory of liability, Max-Planck argues
that Wolf Greenfield owed it a fiduciary duty and violated that
duty through its actions related to the prosecution of the Tuschl
I applications.

Max-Planck makes several arguments as to the basis for the
existence of a fiduciary duty, but the Court need not address
each argument separately at this stage.  Max-Planck cites
persuasive authority supporting the position that an execution of
a power of attorney in Massachusetts creates a fiduciary
relationship.  <u>See</u> <u>Gagnon v. Coombs</u>, 39 Mass. App. Ct. 144, 154,
654 N.E.2d 54, 60 (1995) (holding that a power of attorney
created a traditional principal-agent relationship, which creates
a fiduciary duty "with respect to all matters within the scope of
the agency"); <u>see also</u> <u>Clarizia v. Gelineau</u>, No. 05-P-1175, 2006
WL 1275929, at *2 (Mass. App. Ct. May 10, 2006); <u>Rempelakis v.</u>

-16-

Russell, 65 Mass. App. Ct. 557, 564, 842 N.E.2d 970, 975 (2006). The Court finds that Wolf Greenfield owed a fiduciary duty to Max-Planck, as a result of the execution of a power of attorney. There is nonetheless a genuine issue of material fact as to whether Wolf Greenfield violated its fiduciary duty.

## C.  **Defendant's Motion for Summary Judgment**

Wolf Greenfield moves for summary judgment as to all counts. As to the issue of whether or not an attorney-client relationship existed between Max-Planck and Wolf Greenfield, the Court has found that, even when drawing all inferences against Max-Planck, there is no genuine issue of material fact that the parties were engaged in an attorney-client relationship.  Accordingly, summary judgment is denied as to the question of the existence of an attorney-client relationship.  The Court has also allowed partial summary judgment for Max-Planck with respect to the issue of whether or not Wolf Greenfield owed Max-Planck a fiduciary duty.

There are three issues remaining: proximate causation, statute of limitations, and the request for a declaratory judgment.

### 1.  **Proximate Causation**

Wolf Greenfield argues that Max-Planck cannot prove that Wolf Greenfield's actions were the proximate cause of any harm to the plaintiff.  A plaintiff in a legal malpractice action proves causation by proving it would have achieved a different, better

-17-

result had the malpractice not been committed.  <u>See</u> <u>Poly v.</u>
<u>Moylan</u>, 423 Mass. 141, 145, 667 N.E.2d 250, 254 (1996); <u>Jernigan</u>
<u>v. Giard</u>, 398 Mass. 721, 723, 500 N.E.2d 806, 807 (1986); <u>Fishman</u>
<u>v. Brooks</u>, 396 Mass. 643, 647, 487 N.E.2d 1377, 1380 (1986).
This Court has previously written that "Max-Planck will have to
show that Wolf Greenfield's conflict of interest in the
prosecution of the Tuschl I applications proximately caused the
PTO to reject in whole, or in part, patent claims sought by Max-
Planck.  In other words, it must show that if Wolf Greenfield
were conflict-free, the Tuschl II patent claims would be
stronger."  <u>Max-Planck-Gesellschaft Zur Foerderung der</u>
<u>Wissenschaften E.V. v. Wolf Greenfield & Sacks, P.C.</u>, 661 F.
Supp. 2d 125, 129 (D. Mass. 2009).

Wolf Greenfield argues that because the mammalian and 3'
data and the cross-claim of priority were already in the Tuschl I
application when the firm was retained to prosecute the
applications before the USPTO, any actions taken by the firm
could not have been the cause of Max-Planck's injury.  Under the
co-assignees' agreement, Whitehead was delegated the
responsibility to prosecute the patent applications.  Since
Whitehead made the decision to keep the contested information in
the Tuschl I applications, the argument goes, Wolf Greenfield's
actions had no effect on the content of the applications.

Max-Planck responds that Wolf Greenfield did in fact cause
its injury.  In 2004, Max-Planck asked Wolf Greenfield to remove

-18-

the alleged Tuschl II material from the Tuschl I applications, and to withdraw from the Tuschl I applications the claim of priority to the Tuschl II application.  (Pl.'s Add'l SUF ¶ 36.) Wolf Greenfield drafted a memorandum stating that it was "not aware of a compelling reason to maintain the priority claim in [the Tuschl I applications] with the currently pending claims that are fully supported by [the Tuschl I provisional applications]."  (Mone Decl., Ex. 72 at 182 (Lockhart Dep.).) Wolf Greenfield did not, however, remove the data and the priority claims.  Defendant states that this decision was based upon direction from its client, Whitehead.  Nonetheless, Max-Planck argues that discovery in this case has revealed that Wolf Greenfield was in fact complying with requests from another co-assignee, UMass.  (See Pl.'s Add'l SUF ¶ 39.)  The Court notes that the deposition testimony cited to support that argument is not included in the excerpted depositions currently in the record.  In any event, even if UMass requested Whitehead to make this decision, there is undisputed evidence that Whitehead, not its counsel, was the ultimate decision-maker.

It is clear from the record that Wolf Greenfield could not have removed the contested data from the Tuschl I patent applications over Whitehead's objection.  It is undisputed that Whitehead was represented by Wolf Greenfield, and Wolf Greenfield would have committed legal malpractice by substantively altering a patent application without Whitehead's consent.  Wolf

Greenfield's actions related to the alleged refusal to delete the mammalian data and the priority claims did not cause Max-Planck's injury.  The appropriate course of action once Wolf Greenfield became aware of the conflicting instructions from its joint clients, Whitehead and Max-Planck, would have been to withdraw from the Tuschl I patent prosecution.  Wolf Greenfield did not withdraw, however, and Max-Planck subsequently incurred legal fees in connection with the preparation and litigation of the Goldstein petition before the USPTO.  Max-Planck's damages in this case, at best, would cover the attorney's fees incurred as a result of Wolf Greenfield's refusal to withdraw.  With respect to these fees, the defendant has not established that it is entitled to summary judgment on the issue of proximate causation.

   **2.   Statute of Limitations**

   In support of its motion for summary judgment, Wolf Greenfield claims that Max-Planck's tort claims are time-barred. The parties agree that plaintiff's legal malpractice and breach of fiduciary duty claims are subject to a three year statute of limitations.  See Mass. Gen. Laws ch. 260, § 4.  The statute of limitations begins to run when a client knows or reasonably should know that he has suffered any appreciable harm as a result of a lawyer's conduct.  Williams, 423 Mass. at 473, 668 N.E.2d at 804.  Determining the date on which the statute of limitations begins to run can in some cases involve conflicting evidence that

can raise disputed issues of material fact.   See McBarron v.
Lenahan, 58 Mass. App. Ct. 227, 229 n.4, 790 N.E. 2d 1091, 1092
n.4 (2003).

Wolf Greenfield argues that Max-Planck knew or reasonably
should have known that it suffered appreciable harm as a result
of Wolf Greenfield's conduct as early as the summer of 2004 when
Wolf Greenfield failed to file Max-Planck's proposed Information
Disclosure Statement and, at the latest, by June 1, 2006 when
Wolf Greenfield turned down Max-Planck's request to meet with the
Tuschl I patent examiner.

Max-Planck argues that the harm it allegedly suffered was
its inability to obtain patents on its Tuschl II invention as a
result of Wolf-Greenfield's actions.   The USPTO examiner
expressly informed Max-Planck that it could not obtain patents on
its Tuschl II invention because of the inclusion of the same
material and priority claims into Tuschl I on September 18, 2007.
(Pl.'s Add'l SUF ¶ 35 (citing Kitts Decl. ¶ 7).)   Under this
argument, the Complaint, filed on June 26, 2009, was timely.

However, Max-Planck did anticipate that the inclusion of the
contested data and the claim of priority in the Tuschl I
applications would cause it harm, and engaged another law firm as
early as January 2006 to request that Wolf Greenfield remove the
data.   Plaintiff is seeking recovery of legal fees incurred in
2005 and 2006 as a result of these efforts to delete the
mammalian data and the claim of priority in the Tuschl I patent

applications.  Accordingly, the defendant argues that Max-Planck
knew or reasonably should have known that Wolf Greenfield's
actions were causing it harm prior to the communication about the
Tuschl II patent applications from the USPTO examiner.

Max-Planck argues that, even if it knew or should have known
it had suffered harm prior to June 26, 2006 (three years before
it filed its complaint), the limitations period would be tolled
by the "continuing representation doctrine," which "tolls the
statute of limitations in legal malpractice actions where the
attorney continues to represent the plaintiff's interests in the
matter in question."  Murphy v. Smith, 411 Mass. 133, 137, 579
N.E.2d 165, 167 (1991).  The Murphy court explained

> The doctrine recognizes that a person seeking
> professional assistance has a right to repose
> confidence in the professional's ability and good
> faith, and realistically cannot be expected to question
> and assess the techniques employed or the manner in
> which the services are rendered.  It is not realistic
> to say that the client's right of action accrued before
> he terminated the relationship with the attorney.  The
> statute of limitations period does not begin to run
> until the termination of the undertaking.

Id. (internal citations and quotation marks omitted).  Wolf
Greenfield claims that the continuing representation doctrine
does not apply here because Max-Planck actually knew that it
suffered appreciable harm as a result of the law firm's conduct.
Under Massachusetts law, if a client has actual knowledge, "then
there is no 'innocent reliance which the continued representation
doctrine seeks to protect.'"  Lyons v. Nutt, 436 Mass. 244, 250,

763 N.E.2d 1065, 1070 (2002) (quoting <u>Cantu v. St. Paul Cos.</u>, 401
Mass. 53, 58, 514 N.E.2d 666, 669 (1987)).

The record shows that Max-Planck was aware of a conflict of
interests among itself and the other co-owners with respect to
the inclusion of the contested data and the claims of priority in
the Tuschl I patent applications prior to Wolf Greenfield's
retention as the law firm responsible for the prosecution of
Tuschl I.  (Levine Aff., Ex. G at 459, 461 (Erselius Dep.).)
Although Wolf Greenfield did comply with certain requests for
legal advice and assistance from Max-Planck, <u>see</u> <u>supra</u>, there
were numerous occasions where it was unambiguous that Wolf
Greenfield was following the instructions of Whitehead as opposed
to Max-Planck.  In January 2006, Max-Planck's other attorney,
Rothwell Figg, prepared a revised declaration of Thomas Tuschl
withdrawing the cross-claim of priority in the Tuschl I patent
applications and forwarded to Wolf Greenfield for filing with the
USPTO.  (<u>Id.</u> at 496-97; Levine Aff., Ex. AA.)  On Whitehead's
instructions, Wolf Greenfield declined to file the proposed
declaration and Rothwell Figg ultimately filed the declaration
itself.  (Levine Aff., Ex. G at 496-98; <u>id.</u>, Ex. BB.)  In
addition, on May 30, 2006, Max-Planck caused a request to be made
to Wolf Greenfield that attorneys from Rothwell Figg be permitted
to attend an interview with the patent examiner for the Tuschl I
patent applications.  (<u>Id.</u>, Ex. CC.)  Wolf Greenfield responded,
"[u]pon consultation with my client, we have concluded that we

will decline your offer to attend the interview."   (<u>Id.</u>)

By January or, at the latest, June 1, 2006, Max-Planck was aware that Wolf Greenfield was deferring to Whitehead's instructions, which were clearly in conflict with the wishes of Max-Planck.  This knowledge is corroborated by Max-Planck's reliance on other attorneys in an attempt to protect its interest in the Tuschl II inventions, which was allegedly threatened by the inclusion of the disputed data and claims of priority in Tuschl I.  Accordingly, Max-Planck is not entitled to tolling of the statute of limitations under the continuing representation doctrine, because it had actual knowledge of its own harm.

The complaint in this case was filed on June 26, 2009, and the Court finds that Max-Planck was aware of appreciable harm caused by Wolf Greenfield's actions prior to June 26, 2006.  Max-Planck's claims are time-barred.

### 3.   Declaratory Judgment

Wolf Greenfield's final argument in support of its motion for summary judgment is that Max-Planck's claim for a declaratory judgment is moot as a result of the Goldstein petition granted by the USPTO.  In its complaint, Max-Planck seeks a judgment declaring "that Wolf Greenfield is required to cease its prosecution of the Tuschl I patent applications and withdraw its representation as [to Max-Planck and the other] co-owners." (Docket No. 6.)

-24-

In July 2009, Max-Planck petitioned the USPTO to revoke its power of attorney in favor of Wolf Greenfield and to allow the appointment of Rothwell Figg, another law firm, on its behalf and to act for less than all of the applicants.  This is referred to as the Goldstein petition.  The USPTO granted the Goldstein petition on September 3, 2009 on the basis of the "divergent interests" of Max-Planck and the other co-owners.  Accordingly, now Wolf Greenfield may not prosecute the Tuschl I patent applications in any manner without Max-Planck's express consent because the USPTO will not act upon filings from less than all of the co-owners.  Accordingly, Wolf Greenfield argues that the claim for declaratory judgment in this case is moot.

Max-Planck points out, however, that Wolf Greenfield and Whitehead are attempting to vacate the approval of the Goldstein petition and are arguing that the USPTO acted improperly by granting the petition.  (Pl.'s Add'l SUF ¶ 44; Mone Decl., Ex. 82 (Motion to Vacate Goldstein Petition).)  In addition, despite the fact that the Goldstein petition has been granted, Wolf Greenfield is still the representative of Whitehead before the USPTO with respect to the Tuschl I patent applications and is therefore, Max-Planck argues, still adverse to Max-Planck.

A claim is not moot if the issues presented are "live" or if the parties retain a "legally cognizable interest in the outcome."  Knight v. Mills, 836 F.2d 659, 670 (1st Cir. 1987).  As described, the issues at the core of Max-Planck's claim for a

declaratory judgment have not been fully resolved and are not moot.  The Court denies defendant's motion for summary judgment on plaintiff's request for a declaratory judgment.

### III.  CONCLUSION

Max-Planck's Motion for Partial Summary Judgment [Docket No. 39] is **ALLOWED** with respect to the existence of an attorney-client relationship between the parties and as to the question of whether Wolf Greenfield owed a fiduciary duty to Max-Planck. Wolf Greenfield's Motion for Summary Judgment [Docket No. 37] is **ALLOWED** based on the Court's finding that plaintiff's claims are time-barred, with the exception of the claim for declaratory judgment, as to which the motion is **DENIED**.




 /s/PATTI B. SARIS
PATTI B. SARIS
UNITED STATES DISTRICT JUDGE